NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0379n.06

No. 08-3129

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**May 27, 2009**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| MARIO D. DAVIS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: MERRITT, COOK, and WHITE, Circuit Judges.

COOK, Circuit Judge. On April 26, 2006, a federal grand jury charged Mario D. Davis with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). After the district court denied his motion to suppress, Davis pleaded guilty pursuant to an agreement with the Government. But at sentencing, Davis moved to withdraw his guilty plea. The court denied the motion to withdraw and sentenced Davis to fifty-five months in prison. Davis now appeals the court's denial of both his motion to suppress and his motion to withdraw his guilty plea. We affirm.

I.

On the night of February 23, 2006, officers Phil Messer, Jr., and Jason Bammann patrolled a high-crime area of Mansfield, Ohio, in a police cruiser. At approximately 7:30 p.m., Messer and

Bammann observed a man, later identified as Duane Larkins, emerge from the back of a known drug house. Larkins walked in front of the officers' vehicle, requiring Messer to brake in order to avoid hitting him. According to Bammann's testimony, when Larkins saw the officers, he had a "deer-in-the-headlights kind of look [and] proceeded to pick up the pace" toward a vehicle parked in a lot across the street. After telling Messer to notify the dispatch, Bammann exited the cruiser and called out for Larkins to stop and talk with him. But Larkins ignored him, and continued rapidly toward the parked vehicle.

When Bammann drew near, Larkins turned to face the officer while halfway inside the front-passenger-side of the car, one hand concealed as though "he [were] holding something in his hand." Bammann observed that the vehicle included "several" other occupants. After "countless" orders to show his hands, Larkins finally complied, and Bammann testified that he saw Larkins drop something—later identified as a bag of crack cocaine—inside the vehicle.

While attempting to handcuff Larkins at the back of the car, Bammann ordered the other passengers to raise their hands. Everyone initially followed instructions, but Bammann noticed that the passenger behind the driver's seat—later identified as Davis—pulled his hands down to his lap. Bammann testified that despite repeated (three or four) orders to raise his hands, Davis "would put his hands up . . . [but then] bring them back down," and "kept wanting to fuss around down in his lap area." At that point, Messer reached the car and likewise ordered Davis to raise his hands. Davis failed to comply.

Testimony conflicts as to what occurred next. Messer testified that Davis "reached back on the head board and picked up a paper bag that had a beer can . . . [and] picked it up and then threw it out of the [passenger] window onto the ground." Davis denied any contact with a beer can, and claimed that any fidgeting with his hands resulted from his attempts to tell the officers that the doors were locked. Messer then ordered him out of the vehicle and, after Davis refused, pulled him outside the car and ordered him to place his hands on the top of the vehicle and spread his legs. During the pat-down, Davis "kept trying to turn around and reach into his back pockets," requiring Messer to grab Davis's hands and hold them on top of the vehicle. By that time, other officers arrived and helped handcuff Davis. During the pat-down, Messer discovered a handgun in Davis's back pocket.

After the indictment, Davis moved to suppress all evidence seized from him, arguing that the officers had neither reasonable suspicion for the search nor probable cause to arrest him. Crediting the officers' testimony over Davis's, the district court denied the motion, ruling that Messer's testimony regarding Davis tossing a can of beer from the car established probable cause to arrest him for violating the open-container law, and both officers' testimony regarding Davis repeatedly disobeying orders and placing his hands where they could not be seen established a reasonable basis for conducting a protective pat-down under *Terry*. The district court thus concluded that whether pursuant to a search-incident-to-arrest, or a protective pat-down, the gun was lawfully discovered and seized.

Once the court denied his motion to suppress, Davis pleaded guilty pursuant to a plea agreement that anticipated a reduced sentence for acceptance of responsibility. Five-and-a-half months later, after the Government argued for a sentence at the high end of the Guidelines range, Davis orally moved to withdraw his guilty plea, claiming that "a lot of things are being over stepped." The court denied Davis's request, and this timely appeal followed.

II.

A.

Davis appeals the denial of his motion to suppress, claiming that the officers lacked both reasonable suspicion to stop and search him and probable cause to arrest him. When a district court denies a motion to suppress evidence, we review the court's legal conclusions de novo, and its findings of fact for clear error. *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009). A fact finding is clearly erroneous if our review of the evidence leaves us "with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)). As a rule, this court accords "considerable deference" to the district court's credibility findings. *United States v. McCauley*, 548 F.3d 440, 447 (6th Cir. 2008) (quoting *United States v. Cooke*, 915 F.2s 250, 252 (6th Cir. 1990)). But even under the clearly-erroneous standard, our deference will not excuse a fact finding based on inconsistent testimony or that contradicts the record. *See United States v. Dillard*, 438 F.3d 675, 681 (6th Cir. 2006).

1.

First, the court properly concluded that the officers had reasonable suspicion to stop and conduct a pat-down search of Davis. *See United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008). Typically, the ambit of Fourth Amendment protection includes "brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008) (quoting *United States v. Lugman*, 522 F.3d 613, 616 (6th Cir. 2008)). But under *Terry v. Ohio*, 392 U.S. 1, 30 (1968), an officer without a warrant may conduct such a stop where reasonable suspicion of criminal activity exists. *Arizona v. Johnson*, 129 S.Ct. 781, 786 (2009); *Campbell*, 549 F.3d at 370. Moreover, because "the motivation of a passenger to employ violence to prevent apprehension of . . . a crime . . . is every bit as great as that of the driver," where an officer reasonably suspects criminal activity on the part of a passenger, the officer may order the passenger to exit the vehicle or perform a pat-down search. *Johnson*, 129 S. Ct. at 787 (quoting *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)).

We assess whether reasonable suspicion exists by looking at the totality of the circumstances. *Campbell*, 549 F.3d at 371. In other words, factors that seem benign when considered separately might prompt reasonable suspicion when viewed collectively. *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006). Circumstances such as an officer's own observations, directions from other officers, and the nature of the area and the time of day during which the activity occurred are all relevant for our review. *Campbell*, 549 F.3d at 371. Along the burden-of-proof spectrum, this court

understands reasonable suspicion as "satisfied by a likelihood of criminal activity less than probable cause" and "considerably short of satisfying a preponderance of the evidence standard." *Id.* at 370–71.

Given the circumstances in this case, we agree with the district court's conclusion that the officers had reasonable suspicion to conduct the *Terry* stop. As Davis urges, we begin our analysis by focusing on the initial stop of Larkins. Davis does not dispute Bammann's testimony that the events unfolded in a "well known drug area" where "a lot of robberies-type incidents" took place, that the officers saw Larkins near a residence occupied by a known drug trafficker, and that, upon seeing the officers, Larkins acted startled and "proceeded to pick up the pace" to cross the street. While presence in a high-crime neighborhood alone is insufficient to support a "reasonable, particularized suspicion" that a crime is afoot, the area at issue remains a relevant factor in our analysis. *Campbell*, 549 F.3d at 371 (citing *United States v. Pearce*, 531 F.3d 374, 383 (6th Cir. 2008)). For example, in *Illinois v. Wardlow*, 528 U.S. 119 (2000), the Supreme Court held that a defendant's evasive and unprovoked flight, along with his presence in a high-crime area, aroused sufficient, reasonable suspicion to lawfully stop the individual and conduct a pat-down. *Id.* at 124.

Davis attempts to distinguish *Wardlow* by emphasizing that the individual there: (1) tried to evade police by fleeing in the opposite direction down a gangway and alley; and (2) the officers were on narcotics patrol in a heavy-narcotics-trafficking area. Here, Davis argues, Larkins merely "proceeded at a fast pace to the car parked in the parking lot" and the officers were on routine patrol.

But the record clearly undermines Davis's arguments. Perhaps Larkins did not flee down an alleyway, but he did "pick up the pace" in a manner consistent with "flight," did not respond to Bammann's commands to stop and talk, kept his hand concealed in the car while entering the passenger side of the vehicle, and released an object into the car. Taking into account the area and Larkins's behavior, especially in relation to the concealed object, Bammann reasonably suspected criminal activity.

When conducting a *Terry* stop, officers may take actions "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). Given that Bammann reasonably suspected Larkins of involvement in criminal activity and noted that there were other passengers in the car, Bammann reasonably required Davis and the other passengers to keep their hands in view. *See Johnson*, 129 S. Ct. at 786–87; *Wilson*, 519 U.S. at 410–11 (extending to passengers the rule that a police officer "may as a matter of course order the driver of a lawfully stopped car to exit his vehicle," where the passenger appeared "extremely nervous"); *United States v. Moorefield*, 111 F.3d 10, 11 (3d Cir. 1997) ("We hold that police officers may constitutionally order occupants of cars to remain in the vehicle with their hands up in the air."). The Government persuasively points out that "if because of the danger police face during traffic stops, an officer may order a passenger from a car without any particularized suspicion under [*Wilson*], it necessarily follows that to maintain control during a *Terry* stop and subsequent arrest, an officer may reasonably require a passenger to remain in a car with hands visible." When Davis failed to obey the officers' repeated commands to keep his hands

where they would be visible, it was reasonable for the officers to remove him from the car to perform a protective pat-down. That pat-down led to the discovery of the gun. Thus, the court properly rejected Davis's argument to suppress on the ground that the officers lacked reasonable suspicion.

2.

Second, Davis argues that the officers lacked probable cause to seize him, violating the Fourth Amendment. We agree with the district court that because the officers had reasonable suspicion to perform the pat-down search, which yielded the gun, it is not necessary to find that they also had probable cause to arrest. Nevertheless, the court reached this issue and we agree with its determination. Whether probable cause exists turns on whether the "'facts and circumstances within [the arresting officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent' person to conclude that an individual either had committed or was committing an offense." *Torres-Ramos*, 536 F.3d at 555 (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). A seizure occurs where "intentional interference with a person's liberty by physical force or a show of authority . . . would cause a reasonable person consciously to submit." *Peete v. Metropol. Gov't of Nashville & Davidson County*, 486 F.3d 217, 220 (6th Cir. 2007). We reject Davis's argument.

The district court concluded that Messer credibly testified that Davis discarded a can of beer through the window of the car in violation of Ohio's open container law. Ohio Rev. Code Ann. §

4301.62. That fact provided sufficient basis for finding probable cause. In sum, the district court properly denied Davis's motion to suppress.

B.

We review the denial of a defendant's motion to withdraw a guilty plea for abuse of discretion. *United States v. Haygood*, 549 F.3d 1049, 1052 (6th Cir. 2008). A court abuses its discretion by relying on clearly erroneous fact findings, improperly applying the law, or using an erroneous legal standard. *Id.* Federal Rule of Criminal Procedure 11 allows for withdrawing a voluntarily entered guilty plea accepted by the district court before sentencing where "the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). In weighing whether a defendant articulated a "fair and just reason" for withdrawing the plea, the Sixth Circuit adheres to a multi-factor balancing test, assessing: (1) the amount of time that elapsed between the plea and the motion to withdraw; (2) the presence of a valid reason for failure to move earlier; (3) whether the defendant asserted or maintained innocence; (4) the circumstances underlying entry of the guilty plea; (5) the defendant's nature and background; (6) the defendant's degree of prior experience with the criminal justice system; and (7) potential prejudice to the government if the court granted the motion. *Haygood*, 549 F.3d at 1052. The classic application of Rule 11(d)(2)(B) is refuge for the defendant with "a hastily entered plea" made with "unsure heart and confused mind." *Id.* at 1053 (quoting *United States v. Alexander*, 948 F.2d 1002, 1004 (6th Cir. 1991)).

Davis relies on three points to support his case: (1) his three separate lawyers resulted in no continuity of legal representation and caused confusion and misunderstanding; (2) the terms of his plea agreement did not give him any benefit in exchange for pleading guilty; and (3) the hearing transcripts reflect Davis's lack of understanding. We reject these arguments.

Fatal to Davis's appeal is the extensive unexplained delay between his initial plea and the later motion to withdraw. Davis waited five-and-a-half months before seeking to withdraw his plea. This court has repeatedly found no abuse of discretion where district courts denied long-delayed motions to withdraw. *United States v. Durham*, 178 F.3d 796, 798–99 (6th Cir. 1999) (motion filed seventy-seven days after entry of the plea), *see United States v. Valdez*, 362 F.3d 903, 913 (6th Cir. 2004) ("[Defendant's] unjustified 75-day delay, alone, supported the court's denial of a motion to withdraw."), *United States v. Baez*, 87 F.3d 805, 808 (6th Cir. 1996) (motion filed after sixty-seven days), *United States v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994) (motion filed six weeks afterward, relying on the rule that preceded Rule 11(d)(2)(B)). Davis's delay of twenty-two weeks, or 154 days, is too lengthy a delay for us to find that the district court abused its discretion in denying his motion to withdraw.

Moreover, Davis offers no persuasive excuse for this delay; he never expressed discontent with the plea until sentencing, and, even at sentencing, failed to mention any adverse impact from having multiple attorneys. Neither did he maintain innocence, only challenging the stricter result in federal court as opposed to state court ("I'm just saying five years out of my life for simple

possession, when I didn't hurt nobody."). And although Davis argues that he received no benefit from the plea exchange, he did receive a three-level reduction for acceptance of responsibility.

The district court confirmed at the plea colloquy that Davis was satisfied with his counsel's representation, understood his constitutional rights, and that he acted intelligently, knowingly, and voluntarily. Davis did mention that there were a few rights he did not understand, but he confirmed that he understood his constitutional rights, and both the Government and the court summarized Davis's appellate rights. Davis's numerous convictions suggest that he would not be a stranger to the proceedings, and the record reflects sufficient understanding of the criminal process on Davis's part. The district court did not abuse its discretion in denying the motion to withdraw.

### III.

We affirm the court's denial of Davis's motion to suppress as well as the denial of his motion to withdraw.